**In re CUISINE MAGAZINE, INC., Debtor.**

**Bankruptcy No. 82 B 10486 (TLB).**

United States Bankruptcy Court, S.D. New York.

May 28, 1986.

**212**

Levin & Weintraub & Crames, New York City, for debtor; by Mitchel H. Perkiel.

Siegel, Sommers & Schwartz, New York City, for the Official Committee of Unsecured Creditors; by James D. Beldner.

Elliot Hoffman, Chairman of the Official Committee of Unsecured Creditors, Harold D. Jones, New York City, U.S. Trustee; by John Campo.

### DECISION AND ORDER DETERMINING APPLICATIONS FOR FINAL COMPENSATION AND REIMBURSEMENT OF EXPENSES

CORNELIUS BLACKSHEAR, Bankruptcy Judge.

A hearing was held by this court on March 16, 1986 to consider four applications for allowance of final compensation and reimbursement of expenses. The acrimony engendered by this case warrants a full exposition of the factors which the court considered in fixing such compensation. Said factors shall now be discussed, vis-a-vis each of the four applicants, in the detail necessitated by the gravity of the objections with which we were confronted, as well as the particular concerns of this court.

### I. *Factors to be Considered*

The point of departure for an analysis of the reasonableness of a fee request is section 330 of the Bankruptcy Code of 1978 ("the Code"). 11 U.S.C. § 330 (West's 1979) (pre-BAFJA version cited as case was filed in 1982). Said section provides that, after notice and a hearing, the court *may* make an award to professionals of:

1) reasonable compensation for actual, necessary services rendered by such trustee, examiner, professional person, or attorney, as the case may be, and by any paraprofessional persons employed by such trustee, professional person, or attorney, as the case may be, based on the time, the nature, the extent, and the value of such services and the cost of comparable services other than in a case under this title; and

2) reimbursement for actual, necessary expenses.

11 U.S.C. § 330(a). Thus, the Code explicitly confers discretion upon bankruptcy judges in the awarding of fees. *See Mann v. McCombs* (In re *McCombs* ), 751 F.2d 286 (8th Cir.1984).

■ A series of twelve factors to be considered by a court undertaking such a review was first articulated by the *Johnson* court as follows: (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal service properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases. *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717–19 (5th Cir.1974). *See also Prate v. Freedman*, 583 F.2d 42, 48 (2d Cir.1978).

While *Johnson* involved the awarding of attorneys fees in a class action under title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* (employment discrimination), the factors enunciated by that court were subsequently made applicable to bankruptcy cases. *American Benefit Life Ins. Co. v. Baddock* (In re *First Colonial Corp. of America* ), 544 F.2d 1291, 1298–99 (5th Cir.) (decided under the Bankruptcy Act of 1898), *cert. denied,* 431 U.S. 904, 97 S.Ct. 1696, 52 L.Ed.2d 388 (1977). It should be noted that the *First Colonial* court applied these twelve factors in conjunction with the spirit of economy principle mandated under the Act. *Id.* at 1299. Despite the abandonment of the spirit of economy by the Code, in a conscious effort to attract professionals of the highest caliber to bankruptcy practice, the aforementioned twelve factors remain in effect. *See McCombs, supra,* 751 F.2d at 288; 2 *L. King, Collier on Bankruptcy* § 330.-05[2][a] at 330–23 (1985).

## II. *The Applications*

### A. *Levin & Weintraub & Crames*

■ The law firm of Levin & Weintraub & Crames ("Levin") which represented the debtor, Cuisine Magazine, Inc. ("Cuisine"), in the within action, seeks compensation in the amount of $92,656.95, plus reimbursement of expenses of $4,344.74. Said firm received a retainer of $25,000 from Cuisine which shall be credited to its fee request. No interim compensation has been awarded in this case.

While not raising any specific objections as to the work performed by Levin, the United States Trustee ("the Trustee") did point out that the mixed hourly rate of approximately $168 per hour appeared high. *See* Statement of the United States Trustee Regarding Applications for Final Compensation (filed March 3, 1986) (hereinafter cited as U.S. Trustee's Statement (3/3/86)).

At the hearing the Trustee indicated that the objection to the mixed rate of $168 per hour was based upon his estimation that too much senior attorney time was devoted to this case (Tr. at 30). In response thereto, it was explained that such was the case because, Mitchel Perkiel, the junior attorney assigned to the case became, through attrition over the years, the only person fully familiar with all of the aspects of the case. By such time, Mr. Perkiel had also achieved partnership level and was billing at a rate of $240 per hour. He opined that it would have been unprofessional, and possibly irresponsible, to have assigned lower level persons to the case at that point (three years after filing the petition) because, due to their unfamiliarity with the case, they would have generated twice as much billing time as he (Tr. at 31–32).

The Trustee also noted that the successful reorganization of a debtor is a significant factor to be considered by the court in determining the ultimate award of compensation. *See* U.S. Trustee's Statement (3/3/86) (citing *In re Georgia Steel, Inc.,* 19 B.R. 834 (Bankr.M.D.Ga.1982); *In re Mansfield Tire & Rubber Co.,* 19 B.R. 125 (Bankr.N.D. Ohio 1981)). He then observed that, in light of the fact that it took nearly four years to confirm this liquidating chapter 11 case where unsecured creditors will only receive about 10% on their claims, a lesser fee than that requested may be warranted.[1] *Id.*

At the hearing it was clarified that at least part of the delay in confirming a plan was due to the administrative problems engendered by Judge Ryan's decision to leave the bench [2] (Tr. at 28–29).

---

1. This objection was reiterated as to each of the three law firms applying for compensation. *See* U.S. Trustee's Statement (3/3/86); Statement of the United States Trustee Regarding Application for Final Compensation (filed April 9, 1986) (hereinafter cited as U.S. Trustee's Statement (4/9/86)). The Trustee stated that he had no objection to the reimbursement of Levin's expenses, or to the disbursement requests of any of the other three applicants. *Id.*

2. This case was originally assigned to the Honorable Edward J. Ryan, whose departure necessitated reassignment to the Honorable Tina L. Brozman in 1985. The undersigned judge presided over the hearing on final allowances.

Delay in confirming the plan can also be attributed to two substantial claims against the estate which arose unexpectedly (Tr. at 13–19). In the aggregate, said claims amounted to nearly $10.5 million, against a net estate of approximately one million dollars (Tr. at 14–15). After protracted negotiations, both claims were settled in a manner favorable to the estate (Tr. at 14, 18). It is also noteworthy that Levin is the only applicant herein whose fee request was not objected to by Elliot Hoffman, the Chairman of the Official Committee of Unsecured Creditors (Tr. at 30).

Based on the foregoing, with the court being satisfied with the overall quality of the work performed by Levin in this case, and upon a careful examination of said firm's fee application and the papers in support thereof, it appears that the amounts requested are reasonable. Fees and expenses shall thus be awarded in full.

## B. *Siegel, Sommers & Schwartz*

The law firm of Siegel, Sommers & Schwartz ("Siegel") was retained to represent the Committee of Unsecured Creditors ("the Committee"). Said firm seeks an award of compensation in the amount of $19,245, representing 118.7 hours of legal work, with a mixed hourly rate in excess of $162 per hour. Siegel also seeks reimbursement of $302.50 for expenses, to which the Trustee has no objection. *See* U.S. Trustee's Statement (3/3/86).

The Trustee voiced the same general objections to Siegel's fee request as were raised in conjunction with Levin's application. Said objections have already been subjected to the scrutiny of this court, and so need not be reconsidered at this point.[3] Of a more disturbing nature to this court, are the objections raised by Hoffman, and the underlying acrimonious relationship between Siegel and the Committee which said objections entail.

Specifically, Hoffman voiced a litany of objections to Siegel's representation of the Committee, most of which can be attributed to a failure of communication between Siegel and Hoffman. *See* Affidavit of Elliot P. Hoffman ¶¶ 14–31 (filed March 10, 1986) (hereinafter cited as Hoffman Affidavit). In fact, such a personality conflict and failure to communicate is readily admitted by the attorneys representing the Committee. *See* Affidavit of Harris W. Schwartz ¶¶ 4, 5, 17 & 18 (filed March 24, 1986) (hereinafter cited as Schwartz Affidavit); Affidavit of James A. Beldner ¶ 11 (filed March 24, 1986) (hereinafter cited as Beldner Affidavit).

Said attorneys attempt to mitigate the gravity of this situation by stating that the estate and its creditors were not damaged or prejudiced in any way by the onus on this attorney/client relationship. *See* Schwartz Affidavit ¶ 18; Beldner Affidavit ¶ 11. The favorable aspects of the eventual distribution to creditors are not, however, sufficient to negate the serious implications raised by the stormy nature of this relationship. *See Futuronics Corp. v. Arutt, Nachamie & Benjamin (In re Futuronics Corp.)*, 655 F.2d 463 (2d Cir. 1981), *cert. denied*, 455 U.S. 941, 102 S.Ct. 1435, 71 L.Ed.2d 653 (1982).

In *Futuronics,* the two law firms representing the debtor entered into a fee-splitting arrangement and also failed to disclose the same to the court, in violation of former Rules of Bankruptcy Procedure 215 & 219. In fact, in affidavits filed with the court, the two law firms deliberately misrepresented the nature of their relationship. 655 F.2d at 468–69. The *Futuronics* court denied any compensation on account of this reprehensible conduct, *id.* at 471, despite the fact that one of the firms had rendered extraordinary services, procuring a settlement which would possible enable the debtor to propose a 100% plan, *id.* at 466.

■ While the conduct of Siegel did not rise to such a level of opprobrium as to warrant a total denial of compensation, *Futuronics* is instructive for its refutation of Siegel's contention that the economic bene-

---

3. *See supra* section II. A.

fits eventually bestowed on the creditors can serve to excuse questionable attorney conduct. *Id.*

█ Hoffman further stated that when the relationship between Siegel and the Committee began to deteriorate in July 1983, the Committee was sent a copy of a letter dated July 1, 1983 from Leonard Schwartz to Mitchel Perkiel in which the former represented to the latter that he "ha[d] taken over this matter...." *See* Hoffman Affidavit (unlabelled exhibit). Hoffman stated that the purpose of this letter was to "mollify and mislead" the Committee into believing Leonard Schwartz would be relieving Harris Schwartz due to the inherent personality conflict. *See* Hoffman Affidavit ¶ 23. Thereafter, Hoffman noted that Leonard Schwartz did not donate any further time to the case, let alone "take over." *Id.* In fact, an analysis of the time sheets submitted by Siegel revealed no entries for Leonard Schwartz subsequent to April 22, 1982. *See* Application by Counsel to Official Creditor's Committee (Exhibit B) (filed Feb. 6, 1986).

The scope of the retention of the law firm of Lord, Day & Lord, *see infra* section II. C., also appears to have been a major bone of contention between Hoffman and Siegel. Hoffman indicated that Harris Schwartz was acting against, and deliberately disregarding, the expressed wishes of the Committee in working toward the entry of a broad retention order in favor of Lord. *See* Hoffman Affidavit ¶¶ 3–8; Reply of Objectant ¶ 9 (filed by Hoffman on April 3, 1986).

Objections were also raised by Hoffman vis-a-vis the delays encountered in this case. Said delays have been adequately addressed in reference to Levin's application, thus precluding the need for a reiteration at this juncture. *See supra* section II. A. The plethora of other objections raised by Hoffman can, as previously noted, be traced to the personality conflict between Harris Schwartz and Hoffman, and need not be discussed in any greater detail. Harris Schwartz speculated that said personality conflict was precipated by the fact that Siegel was selected to represent the Committee, rather than Hoffman's own firm. *See* Schwartz Affidavit ¶ 4. This accusation may be true in part, but it still does not serve to fully excuse what this court preceives as a failure by the Siegel firm to adequately represent the interests of its client, the Committee.

On the brighter side, it has been represented to this court that Siegel is foregoing compensation for most of the services rendered subsequent to confirmation, and will not be seeking compensation for services yet to be rendered with respect to the disbursement of over one million dollars of escrow funds to holders of allowed claims. *See* Beldner Affidavit ¶ 13.

In addition, Siegel's time sheets indicate entries aggregating 33.6 hours, roughly 28% of the total time expended on the case, during the critical first three weeks of its retention (at which time the sale of assets to CBS took place), whereas the remainder of Siegel's services were rendered over the next four years.

Accordingly, this court, in the exercise of its discretion, finds that a figure representing 80% of the $19,245 in fees sought by this applicant, i.e., the amount of $15,396, shall be deemed reasonable compensation. Disbursements of $302.50 will be allowed in full.

### C. *Lord, Day & Lord*

Possibly most distressing of all to this court is the fee application of Lord, Day & Lord ("Lord"), special counsel to Cuisine, which requests allowance of compensation in the amount of $27,908.75, as well as reimbursement of expenses totalling $1,022.46.

At the outset, it should be noted that the Trustee initially objected to the awarding of any compensation to Lord because of the firm's failure to submit time records to his office. *See* U.S. Trustee's Statement (3/3/86). Subsequent to Lord's eventual submission of the requested time sheets, the Trustee filed a supplemental statement in which he voiced the same general objec-

tions to Lord's application as were raised in relation to Levin and Siegel,[4] but no other objections. *See* U.S. Trustee's Statement (4/9/86).

We commence our analysis by noting that Lord's time records contain several inconsistencies with the summary sheet submitted by Lord at the request of this court. For instance, this court's calculations based on Lord's time sheets revealed that Vincent M. Kiernan of that firm rendered 54.5 hours (one entry by Kiernan was illegible and so was disregarded by this court) to Cuisine for the period of time between March 16, 1982 and May 25, 1982. Yet, Lord's summary sheet only depicts 41.5 hours for Kiernan during the much longer period of time from March 16, 1982 (the date Cuisine filed its petition) to September 30, 1982. During this period, the firm billed at $60 per hour for Kiernan's time; effective October 1, 1982, Kiernan's time was billed at $70 per hour. Thus, the summary sheet purports to bill the excess over 41.5 hours at the higher $70 rate which was not yet in effect. The summary sheet also contains a slight discrepancy as to Linda Ecksmith's billed hours.[5] Furthermore, Ecksmith's time was billed at $60 per hour for the period in question, yet, the summary sheet indicates that she was not admitted to the bar until 1983. Thus, the firm billed Cuisine for her time at the same rate as for Kiernan, despite the fact that the latter was admitted in 1982.[6]

Of a more disturbing nature to this court, however, is the fact that Lord exceeded the scope of its authorized retention. The order signed by Judge Ryan on May 25, 1982 retained Lord "effective March 16, 1982 *nunc pro tunc* as special counsel *for the services heretofore performed* as set forth in the annexed application...." *See* Order Authorizing Reten-

tion of Lord, Day & Lord as Special Corporate Counsel (filed May 27, 1982) (emphasis supplied). In accordance therewith, the annexed application was altered to read: "Lord, Day & Lord will *not* continue to render services for and on behalf of [Cuisine] as and when requested, their compensation *for past services will* be determined by this Court...." *See* Application ¶ 11 (hand written words have been underscored by this court). Lord questioned the authority for the making of these hand written changes, *see* Response of Lord, Day & Lord to the Affidavit of Elliot P. Hoffman (filed March 25, 1986) (hereinafter cited as Response of Lord), but did not provide this court with sufficient reason for disregarding the clear language of Judge Ryan's order.

■■■ Therefore, the services rendered by Lord subsequent to May 25, 1982 were unauthorized and, thus, not compensable. *See Futuronics, supra,* 655 F.2d at 470–71; *In re Hydrocarbon Chemicals, Inc.,* 411 F.2d 203, 205–06 (3rd Cir.) (attorney who did not secure court approval cannot be compensated out of estate funds despite the rendering of valuable services), *cert. denied,* 396 U.S. 823, 90 S.Ct. 66, 24 L.Ed.2d 74 (1969); *In re Sapolin Paints, Inc.,* 38 B.R. 807, 816–17 (Bankr.E.D.N.Y. 1984) (no compensation allowed for services rendered in excess of the amount authorized in the retention order). The fact that such unauthorized services may have been beneficial to the estate is immaterial. *Id.* The rationale for such a harsh rule is to provide the court with an opportunity to examine the integrity of the professionals to be engaged, 411 F.2d at 205, and to render to interested parties a chance to object to the requested expenditures as being unnecessary, 38 B.R. at 817. Lord's

---

**4.** *See supra* section II. A.

**5.** The summary sheet depicts a total of four hours for Ecksmith, despite the fact that time sheets submitted by the firm show 4.25 hours rendered by her during the March 16 to May 25, 1982 period. A billing memorandum submitted by Lord depicts a total of five hours for Ecksmith over a longer period.

**6.** This, of course, assumes that the years of admission as stated on the summary sheet are correct, and not the result of an oversight. While the answer to this conundrum is beyond the ken of this court, we note the inconsistency and the underlying sloppiness in Lord's application.

reply affidavit failed to persuade this court that it should rule otherwise. In fact, in addressing the scope of the retention order, Lord omitted any reference to the critical language viz., "for the services heretofore performed...." *See* Response of Lord ¶ 3.

■ According to Hoffman, the changes in the Lord retention order and application were necessitated by objections from the members of the Committee over Lord's being retained for any future services. *See* Hoffman Affidavit ¶¶ 3-8. While Hoffman acquiesced to Lord's authority to have rendered services to Cuisine during the period from March 16 to May 25, 1982, he raised issues as to the nature of the work to have been performed by Lord during such period. Thus, he stated that Lord was only authorized to have rendered services pertaining to the sale of assets to CBS, and that any work relating to the QPR litigation, tax planning, or the reorganization project was unauthorized. *See* Hoffman Affidavit ¶¶ 9 & 10. Despite any misunderstandings Hoffman may have had vis-a-vis the scope of Lord's retention, we note that the retention order does not contain any such limitations. We thus feel it would be inherently unfair to impose such limitations (based on an amorphous understanding of the nature of the work Lord was to have performed) on Lord at this juncture, when such a circumscription was not clearly articulated in the original retention order.[7]

We now turn our attention to an analysis of the reasonableness of Lord's application. As noted above, the only services for which Lord is potentially compensable are those rendered between March 16 and May 25, 1982. For this period, Lord submits time entries, aggregating 92 hours,[8] pertaining to six attorneys for a total of $9,145. All other entries will be disregarded, as they pertain to a period of time for which Lord was not authorized to render legal services to Cuisine.

■ Lord's time sheets reveal no less than ten entries relating to the status of the order for the retention of Lord as special counsel to Cuisine, most of which consist of telephone calls to this court or to Mitchel Perkiel. We find this to be excessive, and do not deem this time as being compensable from estate funds. Five entries totalling 1.75 hours relate exclusively to such pursuits and will be deducted from the 92 hour figure. The other entries relating to the status of the retention order are found on time sheets containing multiple explanatory remarks. These range from one to 7.5 hours, with no breakdown of services included. This court will thus use 0.35 hours as the average time expended on such pursuits (derived from averaging the 1.75 hours with the five exclusive entries noted above), providing us with an additional 1.4 hours[9] to be deducted from the potentially compensable hours.

■ In addition, Lord's time sheets contain four entries, totalling seven hours, during which time the firm reviewed billings. Such should not be compensated out of estate funds and, accordingly, will be deducted.

After subtracting the hours indicated above from the billings of the appropriate attorneys, we are left with the following: Kiernan, 44.85 hours at $60 per hour for a total of $2,691; Thoman, 23.25 hours at a rate of $200 per hour for a total of $4,650; Hilbert, $800 for eight hours work at a $100 rate; Ecksmith, four hours at $60 for a total of $240; Engros, $85 for one hour of work; and Stitzer, 0.75 hours at a rate of $85 per hour for a total charge of

---

**7.** If Hoffman was under the impression that the May 25, 1982 retention order was too broad, he should have brought an appropriate motion before this court at such time.

**8.** As previously noted, one of the entries for Kiernan during this time period was illegible and was, thus, not considered by this court.

**9.** The 1.4 hour figure was obtained by multiplying the 0.35 average by the remaining four entries. The tenth entry referred to above was found on the time sheet which was disregarded because its notation of the hours spent on such services was illegible.

$63.75.[10] Thus, we are left with a total of $8,529.75.

■ Based on the aforementioned inconsistencies, and the fact that the brevity of the explanations accompanying most of Thoman's entries (which comprise the bulk of the $8,529.75 figure) leaves little guidance for this court in ascertaining the reasonableness of the fees sought, a further reduction of this amount may be justified. This court, however, in an exercise of the discretion accorded to it under the Code, declines to embark upon such an endeavor, as it is generally satisfied with the quality of the work performed by Lord.[11]

■ Of the disbursements sought by Lord totalling $1,022.46, the amount of $447.56 allocated to "Lexis and miscellaneous," will be deducted. Such disallowed expense constitutes part of a firm's normal overhead, and as such, should be included in the hourly rate charged for the firm's legal services. See Sapolin, supra, 38 B.R. at 816. Lord's request for the reimbursement of $299.15 for "staff overtime" shall also be disallowed because the firm has failed to provide the court with any documentation establishing the need for, or purpose of, such expenditures. See In re Island Helicopter Corp., 53 B.R. 71, 73 (Bankr.E.D.N.Y.1985). A bald assertion by Lord that the billing of staff overtime is its "standard practice," see Response of Lord ¶ 9, hardly qualifies as adequate documentation. The remaining expenses, in the amount of $275.75, are granted.

## D. David Berdon & Co.

The Committee retained the firm of David Berdon & Co. ("Berdon") as its accountants to review the books and records of the debtor. Said firm now seeks this

court's approval of its application for compensation in the amount of $14,677.50.

The Trustee indicated that he had no objections to Berdon's application. See U.S. Trustee's Statement (3/3/86). This court, being generally satisfied with the work performed by Berdon, shall make short shrift of Hoffman's nebulous objections to the application of said firm.

Basically, Hoffman's objections to Berdon's application stem from the fact that the law firm of Siegel, Sommers & Schwartz failed to provide him with information he had requested vis-a-vis the work being performed by the accountants, thus precluding him from properly evaluating the services in question. See Hoffman Affidavit ¶ 13. At the hearing held on March 11, 1986, Hoffman represented to this court that he "could have totally unvalid [sic] objections to the accountant," and he blamed the Siegel firm for precipitating this situation (Tr. at 56).

The only substantive objection Hoffman voiced as to Berdon's application can also be traced to a lack of information on his part. Thus, he questioned Berdon's delay in commencing work on Cuisine's books and records, indicating that such work did not begin until January, 1983, despite Berdon's being retained in August, 1982. See Hoffman Affidavit ¶ 12.

Hoffman, however, failed to take into account 170.5 hours, the bulk of the 235 total hours expended, which the firm incurred in 1982. See Statement of Daniel Plesser ¶ 4.[12] There was, of course, some delay by Berdon in commencing work on Cuisine's books, but, this can be attributed to the time required by the debtor's personnel to close Cuisine's books, which had not been posted since October 31, 1981. Id. ¶ 3.

---

10. The aforementioned deductions were apportioned accordingly: Kiernan, deduction of 9.65 hours; Ecksmith and Stitzer, deductions of 0.25 hours for each.

11. It should be noted that the $8,529.75 in compensation which we are awarding to Lord barely exceeds 30% of the total amount sought by said applicant.

12. Plesser submitted a signed statement to this judge, but the Office of the Clerk of the Bankruptcy Court has no record of any copy being filed therein. Accordingly, the chambers copy (a signed original) was docketed with the Clerk's Office on May 19, 1986, at the direction of this court.

Upon being provided with sufficient information regarding Berdon's fee application, Hoffman withdrew his objections thereto. *See* Reply of Objectant ¶ 4 (filed April 3, 1986). Regardless of the absence of any objections to a fee request by a party in interest, it is still incumbent upon the bankruptcy court to conduct its own independent analysis of all applications for compensation. *See* In re *Watson Seafood & Poultry Co., Inc.*, 40 B.R. 436, 438 (Bankr.E.D.N.C.1984). This court has done so, and is satisfied that Berdon performed services of value to the estate in a professional manner. We deem applicant's request to be reasonable, and thus grant compensation in the full amount of $14,677.50.

### III. *Awards of Compensation*

Applications for allowance of final compensation and reimbursement of expenses having been filed by the parties set forth hereinbelow (collectively the "Applicants") in accordance with the procedures established by this court pursuant to order dated December 20, 1985, and notice thereof having been given in accordance with said order as evidenced by the affidavit of service filed herein, and upon (i) the statement filed by the United States Trustee; (ii) the response filed by the Chairman of the Official Committee of Unsecured Creditors (iii) the affidavits filed by the various parties; and upon (iv) the record and minutes taken before this court at the hearing held on March 11, 1986, and upon all the proceedings heretofore had herein, and after due deliberation and sufficient cause appearing therefor, it is

ORDERED, that the applications for allowance of final compensation and reimbursement of expenses of the Applicants are granted as follows:

| Name of Applicant | Amount Requested | Compensation Granted |
| --- | --- | --- |
| Levin & Weintraub & Crames Counsel for Cuisine Magazine, Inc. 225 Broadway New York, N.Y. 10007 | Fee: $92,656.95 (on account of which $25,000 was previously received) Exp: $ 4,344.74 | Fee: $92,656.95 Exp: $ 4,344.74 |
| Siegel, Sommers & Schwartz Counsel for the Committee of Unsecured Creditors 2 Park Avenue New York, New York 10016 | Fee: $19,245.00 Exp: $ 302.50 | Fee: $15,396.00 Exp: $ 302.50 |
| Lord, Day & Lord Special Corporate Counsel for Cuisine Magazine, Inc. 25 Broadway New York, New York 10004 | Fee: $27,908.75 Exp: $ 1,022.46 | Fee: $ 8,529.75 Exp: $ 275.75 |
| David Berdon & Co. Accountant for the Committee of Unsecured Creditors 415 Madison Avenue New York, New York | Fee: $14,677.50 | Fee: $14,677.50 |

and it is further

**220**

ORDERED, that Cuisine Magazine, Inc. be and it hereby is authorized and directed to make or cause to be made the following payments of the amounts allowed herein:

a) to Levin & Weintraub & Crames: compensation for services rendered in the amount of $67,656.95 (giving effect to the sum of $25,000 previously paid to, and received by, Levin & Weintraub & Crames as a retainer), and the sum of $4,344.74 representing reimbursement of out-of-pocket disbursements;

b) to Siegel, Sommers & Schwartz: compensation for services rendered in the amount of $15,396.00, and the sum of $302.50 representing reimbursement of out-of-pocket disbursements;

c) to Lord, Day & Lord: compensation for services rendered in the amount of $8,529.75, and the sum of $275.75 representing reimbursement of out-of-pocket disbursements; and

d) to David Berdon & Co.: compensation for services rendered in the amount of $14,677.50,

and it is further

ORDERED, that the law firm of Levin & Weintraub & Crames take appropriate action to ensure the prompt distribution (to the creditors of Cuisine holding allowable claims) of the moneys currently being held in escrow, after taking into account the compensation granted herein.